Good morning, Your Honors. May it please the Court, Assistant United States Attorney Jessica Che, with me is Assistant United States Attorney Margaret Chen, and together we are here on behalf of the United States. With the Court's permission, I would reserve five minutes of my time for rebuttal and to address the issues on class appeal. After a 10-day bench trial in this FTCA case, the District Court awarded Miguel Martinez-Pineda and his wife a combined $19 million in economic and non-economic damages. It did so after finding the United States was 85% at fault for a tragic car accident in which Mr. Martinez-Pineda rear-ended an LAV. The Court committed multiple reversible errors in doing so. First, the Court erred in awarding Ms. Altaiva approximately $9 million in loss of consortium damages, those damages that characterized as punitive damages against the United States. Under California law, Ms. Altaiva was foreclosed from recovering any non-economic damages as a co-owner of the uninsured vehicle Mr. Martinez-Pineda was driving at the time of the accident. However, the Court concluded that she was not an owner, despite her knowing and active participation in the purchase of that car. Well, knowing is a hard word here. How do you distinguish the Savnick case? I distinguish the Savnick case because in that case the putative owner had no knowledge that her name was on the registration. By contrast, Ms. Altaiva went to the Kia dealership to purchase the car with her husband. She signed her name multiple times on the purchase documents. She co-signed the loan that financed the vehicle, and she later submitted an administrative tort claim to the Navy. Pause for a second. Let's just stick with the Kia dealership and what happened there. Have you ever bought a car? Have you bought one recently? I have, Your Honor. You have a fast shuffle of papers. Papers are coming at you from every which way. There's arbitration agreements, this, that, and the next thing. And we're talking about a person who is, A, from another country, B, unsophisticated. Are you saying that that by itself, signing all these papers, ends the story good enough? I am saying that, at most, Ms. Altaiva has established that she may not have appreciated the legal import of her signature on those documents. But the record reflects that she knew that she was there to purchase a car. That's what she testified. She knew that somebody was there to purchase a car. She was there for a car to be purchased. Yeah. She was used to purchase a car. At trial, she testified that, I went to the Kia to purchase the car. Did she say, I, or did she say, we? I believe she said, I, Your Honor. She went there to the Kia to purchase the car. And she went with her husband? She went with her husband, correct. And her husband said, please sign these things? He did. Yeah, okay. So, again, I think the record reflects that she may not have understood the import, the legal significance of her signature on those documents. Right. And so how is that different than from Savnik, where you say, did not know that she was an owner? You just said she didn't understand the legal significance. In Savnik, the girlfriend was not even aware that she had been put on the registration of the car. No, I understand that, but you just said she may not have been aware of the legal significance. That is to say, she may not have been aware of the fact that she just said she was the owner. But she was aware of her participation in the purchase, Your Honor. Well, of course, that's true. You may not wish to stick with the statement you just made, that she may not have been aware that she was an owner. No, Your Honor, I think that there's a distinction between her appreciating what all these documents mean. You're visited with a stack of documents when you go to purchase a car. And it's actually, the documents are like in some other room, and they keep coming in and out and in and out. It's just a flurry of activity, and you don't know what they're calling your bank. I mean, you know, I've been recently, too. I mean, I would know, obviously, if I purchased a car, but I'm not sure. And she never drove the car. She never drove the car. She did have a driver's license. But Proposition 213 applies to owners and operators, Your Honor. So the fact that she didn't drive the car. But just to review the evidence on her side of the question, she goes with her husband. She is, at that point, limited in her proficiency in English. She's limited in her sophistication about American habits or customs, the way of doing business. She does not know how to drive. She does not have a driver's license. Her husband handles all of the insurance matters at home. Insofar as she had any sort of paperwork dealing with the car, it was only at the dealership. Was all of that true? Most of it is true, Your Honor. What's not true? Well, I think that Your Honor is overlooking the administrative tort claim she later submitted. Well, no, I didn't say anything about that. If there's anything I said, not true. With respect to the purchase of the vehicle, what you said is true, Your Honor. And what about with respect to dealing with insurance matters at home and all the bills associated with that? I think she had nothing to do with that either. I think that's correct, Your Honor. And is it also true, then, that she did not know how to drive at that time, did not have a driver's license at that time? That's correct. So it sounds like everything I said was true. You may wish to add something. If I could. So what I would add is that Ms. Altaiba later affirmatively asserted her ownership in submitting an administrative tort claim to the Navy for the vehicle's loss. She was the sole claimant on that administrative tort claim. She submitted the sales receipt that listed both her and her husband as co-owners of the vehicle. What she effectively tried to do was to get the vehicle back to the Navy. I think it is a – Well, so let me put my question in a different way. Are you saying that if you submit an administrative tort claim saying I'm the owner, that forecloses you from arguing that you're not for purposes of this statute legally? I think that that – certainly the totality of the record. That's not what I asked. Do I think that it alone should be dispositive? In this case, yes, Your Honor. So you think submitting an administrative tort claim saying you're the owner legally forecloses you from arguing in court that you're not. That's what you're saying. That's my question. Don't change my question. Just go with that one. My answer is yes, Your Honor. Is there some authority that says that? Because you'd think that with 80 years of history of the Federal Tort Claims Act, that would have come up before. You didn't cite anything in your brief that says that. Do you have some authority? I don't have any authority as I stand here today, Your Honor. But taking the record in its totality, okay, and even if you view this as a question of law or fact, the district court's conclusion that she was not an owner on this record simply is not plausible. So you're asking us to fight. So it is a question of fact under California law, and there's a number of factors to be considered.  The district court viewed this, I think, as a question of law. It relied on it. I think so. I mean, it was clearly set out as a question of fact. The court relied on the fact. Wait a second. But whether the district court viewed it as a question of law or not, that's not really the issue for us. The question is whether for purposes of an appeal, whether it's a question of law or a question of fact. The underlying facts as to the question are undisputed. So the question is whether or not she is an owner for purposes of Prop 213. I'm not sure that you can say that the underlying facts are undisputed, but that's what Judge Fletcher was asking you about on knowledge. There's no reason to go back to that. But even assuming this is a question of fact, that's subject to clear error review, it is clear that a mistake has been made. The multiple indices of her ownership, simply it's not plausible to conclude that she wasn't an owner on this record. I think it's possible to be an owner for some purposes and not for others. And we're talking about whether is she an owner for purposes of Section 3333, however many 3s point 4. So she might have been an owner for some purposes. They're punitive owners. They're constructive owners. They're our owners. But the question here, is she an owner within the meaning of this section? And Stavnik goes pretty far in her favor. Well, I would direct the Court's attention to the Honsicle case where the Court of Appeal examined a similar attempt to imply a good faith exception into Prop 213. And in that case, the plaintiff, her argument was that I tried to get insurance, but I couldn't because I couldn't get a driver's license because I don't have immigration status. And the Court of Appeal rejected that argument. But that's, I think, our question is were you insured. Is that right? Were you insured? That's a different question. The question here is, is she an owner within the meaning of the statute? Correct, Your Honor. But it's an analogous argument that they're trying to make in terms of this, I am not the person that Prop 213 was intended to punish. But Stavnik is distinguishable in that the girlfriend in that case had no, she didn't participate in the purchase of the car. She contributed no funds to the purchase of the car. Now, Ms. Altaiba didn't contribute any funds either, but she co-signed the loan that financed that car. She was there, went at the dealership, and knew that they were there to purchase a car. That is materially distinguishable from Stavnik, I would submit to this Court. Okay, maybe we should move on. There are a lot more issues. The district court, I would submit, also applied the wrong standard of care. Specifically, it applied a heightened extreme caution standard of care that's reserved only for inherently dangerous activities under California law. What's the level of generality at which you're supposed to assess whether it's inherently dangerous? Is it just driving down the road, or is it driving a convoy of slow-moving vehicles down the desert road in the middle of the night going 30 miles below the speed limit, etc., etc.? Applying the private person analog, as the Court was required to do, this is a group of three vehicles, three very large vehicles, albeit, driving down the highway at night. Very large, non-ordinary vehicles. Slow-moving vehicles on a 70-mile-per-hour freeway. They don't seem to have very many lights. They had taillights that were compliant with the California Vehicle Code. But they had somehow gotten themselves out of order so that the one that Mr. Martinez-Menina hit actually didn't have the kind of signage and everything that the last vehicle in the convoy ordinarily has. That's correct. But a vehicle of comparable dimension and size would not be required to have that signage and reflective tape under California law. What would that be? An oversized vehicle, Your Honor. With three oversized vehicles? In a row. But one oversized vehicle that would require signage and reflective tape under California law, but it's not disputed that the dimensions of this light-armored vehicle did not constitute an oversized vehicle. A really picky little factual question. There's references in the briefs to hazards, which I assume means lights. Yes. Is there anything in the record that says whether they're flashing lights or whether they're just on? Yes. The district court's findings were that the hazard lights were operational. But it wasn't what I asked, whether they flash. Yes, they were flashing. Am I going to find that somewhere in the record of the trial, that they were flashed? I know there's different kinds of hazard lights, right? The ones that I'm familiar with in driving a car is when you push that button on the steering column, something starts flashing. I don't know if that's what we're talking about here or not. What I'm wondering is whether there's something in the record that says whether what are referred to as the hazards were flashing. My recollection is that that would be in the testimony of Jeremy Oakley and Austin Bunch. Jeremy Oakley and Austin Bunch, Your Honor. But the district court did find that the hazard lights were operational. Let me come back to the focus of the argument. The focus of your argument is that the standard of care is not an elevated standard of care? Correct, Your Honor. And neither the district court nor appellees cited any California cases for the proposition that the operation of a military vehicle by its military nature alone is inherently dangerous. If the standard of care is mere negligence? Yes. And if the district court appropriately found negligence, does that make any difference to the case, what the standard of care is? Does it mean to change the measure of damages? Does it do anything like that? I think that it could change the measure of damages, Your Honor, because under the reasonably prudent person standard of care, a person is required only to use due care commensurate with the proper operation of the vehicle. So here the vehicle had its taillights. It had its flashing hazard lights. Maybe you didn't understand my question. I apologize. I'm assuming that the district judge, this is counterfactual, but I'm assuming that the district judge applied a pure negligence standard of care and the district judge found that there was negligence and then the district judge assessed the damages that it assessed, the same ones. Is the fact that it was a different standard of care that the judge found violated, does that have any impact on damages? I think it would to the extent that 75% of the liability was attributable to the lack of signage and reflective tape. So the question then becomes, under a reasonably prudent person standard of care, would a reasonably prudent motorist be required to apply signage and reflective tape operating a vehicle of that dimension? You're saying there might have been a lower percentage assigned. Correct. I want to ask you about the reversionary trust, but maybe that's better to do when you come back. Yes, I absolutely could. I think you're using up your time, though. So if you wanted to reserve five minutes, you have four minutes. I did. I just quickly wanted to just bring, with regard to the standard of care question, to bring the Court's attention specifically to the Smith case that involved the operation of a fully loaded logging truck, and that truck found itself at a complete standstill and the plaintiffs won an only lane of travel, and the California Court of Appeals concluded that the operation of a ponderous object such as that truck was not an inherently dangerous activity. I'm sorry, you dropped your voice. The operation of a fully loaded logging truck that it characterized as a ponderous object was not an inherently dangerous activity. So applying California law, I think that the operation of the vehicles in this case similarly would not be considered inherently dangerous. So I will reserve the rest of my time. All right. Thank you, counsel. Thank you. All right. Ms. Guzdorf? Good morning, Your Honor. We appreciate your staying home if you think you might be ill. We've noted the increase in cases of COVID and other respiratory disease in Los Angeles. Yes. Thank you, Your Honors. I apologize for the last-minute change, but I just wanted to err on the side of caution with my fever. So may it please the Court, I'm Janet Guzdorf for the appellees and cross-appellants. Unless this Court wants me to address the issues in a specific order, I'll just start with the negligence standard issue. I think Judge Fletcher was asking, is that issue outcome determinative or does it affect the amount of fault that was attributed to the government? No. I don't believe it is outcome determinative, partially because what the district court judge did was looked at all of the issues together. At pages 28 and 29 of his opinion, I'm sorry, the excerpts of record, in his opinion he says all of this needs to be, I'm paraphrasing, considered together. All of these violations kind of provide background. And he goes through very systematically all of the issues that contribute to the negligence that the signage and these other issues cause. He talks about the speed of the vehicle, the fact that the vehicle is huge. It's not analogous, by the way, to a logging truck. This is a 13-ton armored vehicle. Let me interrupt for just a second. I can't remember in the logging truck case, was that daytime? I believe it was. If we're talking about this vehicle, these vehicles in the middle of the night on the so-called highway of death, that may be a different proposition. Exactly. And they're camouflaged dark green, so that doesn't help anything either and that's something that the court noted. And although they did have working taillights, they were dim, they were dusty. But the court wasn't just focused on whether they met the regulation and complied with the regulation or not. That was a factor. But the court also faulted them for not preparing for the inevitable breakdown of this convoy. There was evidence that they knew this was likely. I mean, they had these tow trucks available, ready for them to use if they needed to. They had set hot points where they needed to check and make sure things were still working. And in light of that, the court faulted them for not basically having signage just in case they get mixed up. Not to mention that this group of three LAVs took off and just left the other two that had had the signage in the middle of the median, I think. I don't think that was ever clear exactly where they left them. But that's why they weren't able to contact them, I guess. But one of the main issues I think that's being overlooked is that the judge didn't specifically rule on a regular negligence issue because the government didn't actually ask them to. There's no evidence that I found in the record that the government requested an ordinary negligence standard and certainly didn't object when the court used the jury instruction 414. But I think the reason for that is the government also conceded that these are inherently dangerous vehicles. They're hazardous by nature. It's stated in their own standard operating procedures at 5 ER 1036. Jeremy Oakley, who was the vehicle commander of the LAV, he said that they were hazardous by nature. So I think it's a little disingenuous to say that these are just ponderous objects. They are hazardous and they are not allowed to go beyond 35 miles an hour. Also, in terms of finding a civil analogous case, there really is something relatively unique about a armored tank. But I was curious when I Googled. Civilians actually can purchase tanks. So I don't think that the fact that these are military vehicles means that we can't use them as the standard. Granted, civilians aren't usually allowed to drive them on freeways. Unless this court wants me to address the discretionary function issue, I know opposing counsel didn't. So tell us your argument why the district court erred in imposing a versionary trust. Well, there is no basis in California law for it outside of the micromedical malpractice circumstances. It's been 40 years since the legislature instituted that for med mal cases. They haven't done anything with the rest of court law. So there isn't any authority for it. In addition, in this case, it's really unique. Because normally, in a case, a government torts claim, where the attorney's fees are kept and usually paid from a lump sum from the non-economic damages. In this case, Mr. Martinez doesn't have any non-economic damages because of the Prop 213. And thirdly, in all of the cases that were cited that do apply a reversionary trust, there's additional protections that are offered for the recipient, which wasn't available here. In the other cases, they use the life expectancy of the pre-injury. So it's a much longer amount. So there's a higher inflated damages amount. Here, there wasn't. Also, in other cases, the plaintiff agreed or requested or, I guess, was incapacitated and couldn't. In this case, Mr. Martinez is perfectly capable of putting his own funds in an annuity if he wants to spread it out over time. But he specifically said, no, I don't want this. And on top of all that, it just doesn't make any sense to pay attorney's fees over 17 years either. I realize that's a bit of a side issue, but it's just nothing about this reversionary trust makes any logical sense. And this was a bench trial? It was. Yeah. And so does the district judge say, I'm going to give you an award of $9 million plus of which it's going to be? And does he say that from the outset? Does he just say there's $9.9 million and then later come to the reversionary trust? I'm trying to figure out in what steps the district judge came to this conclusion. I need to revisit that. I believe that the ongoing- My recollection is there was some discussion of that during the hearing where the judge was delivering his oral findings and conclusions. And I believe that he asked the parties to brief the issue. And also, I believe there was subsequent discussions about it. And counsel objected, but then tried to make the best of that situation. But yeah, I believe it was a prolonged discussion about the propriety of this standard. And then do we, in your view, do we need to remand because the life expectancy was miscalculated? Regarding- Years. I mean, this court has a much easier ability to just simply reverse the decision to put it in a reversionary trust and simply award it as a lump sum. Right. I think that's probably easier. But separate from that, you make an argument that it was miscalculated. The loss of consortium was miscalculated. Yes. I believe that there is evidence, and I cited it in my brief, about what his life expectancy would have been had there not been an accident. The judge made a factual determination in favor of plaintiff's expert that the preexisting immunocompromised condition didn't affect his life expectancy. And so I think that this court could just simply use that evidence and apply the correct life expectancy. But if this court has hesitation, that issue, that very narrow issue, certainly could be remanded. Yeah. Well, we could remand with instructions. Yes. Yeah. Yes. But just to make sure we understand the argument, the argument with respect to consortium is that the court awarded damages as to the life expectancy after the accident. But in fact, the argument is consortium should have been awarded as to consortium for the life expectancy that would have existed absent the accident. That's the argument. That is correct. Okay. Had there been no accident. Yeah. Is that it? Yes, because she lost the ability to enjoy that time that she otherwise would have had. That is the reasoning. That's the argument, yeah. Yeah. Okay. And I don't speak for my colleagues. I agree with that argument. The government may wish to respond when she gets up again, but okay. And then I just want to briefly mention the issue of ownership really is a factual determination. SAVIC, which is California, court said it's a factual issue for the jury. Obviously, here it's a bench trial. But there's a lot of factors and no one factor is determinative. Certainly, there's prima facie evidence of ownership, but that's why the court went through all these other indicia of not being an owner. And it's ironic because Ms. Altayba could not even obtain insurance for herself at the time. She was an excluded driver on the policy. So there's so many reasons why the judge relied on the totality of the circumstances to find that she was not an owner of that vehicle for purposes of 333.4. I'd just also like to briefly touch on Mr. Martinez being exempt from non-economic damages. I understand this court probably does not have the authority to award him, but I do think that California clearly has a split of authority on whether the Prop 213 has a Santer requirement. SAVNIC says it does. There are other cases that don't. There's other cases that follow SAVNIC, and I do think that this is a very discreet issue that could be certified to the California Supreme Court. Opposing counsel didn't mention it in their briefing, but... ...to the question of purchase of insurance, right? It applies it to the question of ownership, which is different from what you're arguing with regard to Mr. Martinez-Pineda. Yes. Well, Mr. Martinez-Pineda did not intend to not have insurance. Oh, no, that's my... But my point is that there's no question that he was an owner, and when you say that a California court has applied a C-enter standard to the statute, that wasn't on the question of... It was on the question of ownership as opposed to the question of purchase of insurance. In other words, there's no California case that says that you have to deliberately not purchase insurance, right? I think that the whole... Not that I'm aware of. Okay. I think that the cases that talk about it are in the context of the ownership versus insurance, but I think they're very connected to the issue of insurance because the whole reason behind the statute is to deter people from driving without insurance. Of course. Well, that was a large part of it. So I do think that this is an issue that really does need to be clarified. Certainly... This is an important issue in terms of the amount of damages that might be available. Clearly, the reading that we've got below with respect to 333.4 as to non-economic damages greatly affects the amount. So give me your best argument as to why we should not count against the plaintiff here the fact that, in fact, he did not have insurance. He had no idea he didn't have insurance. He did not receive the information that he had lost the insurance. I believe that case is separate and is currently stayed, but... When you say that case, what case? Oh, sorry. There's the issue with his insurance company. Oh, the suit. Okay. Sorry. Sorry for interrupting. And I do believe, based on the legislative history and the purpose for the statute, that Mr. Martinez-Pineda just does not fit that... does not fit the spirit of this statute. Let me understand the interrelationship between this case and, I gather, a case against the insurance company. Is the argument in the case against the insurance company was that they failed to alert him? I mean, for purposes of our case, what are we supposed to understand in terms of what he knew or didn't know about the fact that he was not current on his premiums? For purposes of this case, what's in the record is he did not know. And the district court judge found that he did not know he didn't have insurance at the time. But there is a presumption by law that he received something that was mailed to him. So that is why the judge found that he fell within the statute, that he was uninsured at the time. And what do we know from the record in this case about the manner in which he was paying for his insurance? Was he paying for it himself by monthly check or periodic check? Was it taken out of? Sometimes if you finance a house, and maybe if you finance a vehicle, the payments you make to the seller include the insurance that the seller is making. So what do we know about the manner in which he was paying for his insurance? What, if anything? I know that he was paying monthly. He was paying himself? That is to say he was writing the checks? I don't think that that was clear in the record. I don't recall seeing any testimony. I believe there might be some receipts that the government might have included in their excerpts. I can check in their argument that he's an owner. They may have included evidence of that. The fact that it got cut off suggests that it wasn't a direct deduction from a bank account, but I guess I can't say that for sure. I'm not sure. And it also suggests that it's not that he paid payments on the car, and that the payments on the car were designed to include insurance payments. I'm not sure if they were tied together, because I agree that if he wasn't paying for the car and the insurance, the driver would. Is there any case in California that says that it, I guess, implies a scienter element into the statute? I think Judge Kennelly made that distinction that there is. I mean, Savnik and there's a couple that follow it imply the scienter requirement into the statute. The context of those cases, though, do deal with the insurance issue and not the ownership issue. So I don't have anything to cite that is specifically on point factually with this case. But I do think that the scienter requirement, if you're going to imply it for one purpose, you can imply it for both. And I think the public policy and the legislative history supports that as well in this case. One other thing I wanted to say before I forget regarding the, and I'm switching modes here, but back to the loss of consortium damages for Ms. Altaiba. The court did reference punitive, but it was in passing, and I believe it was just a misstatement. He mentioned it once. They're clearly loss of consortium damages, a compensatory. This isn't a punitive damages award. I do think that the court heard all the evidence and was very sympathetic to my clients for obvious reasons. But these are not punitive damages. I don't want to overlook the discretionary function exception argument that opposing counsel had raised. If this court feels like there's something that needs to be addressed there, but the bottom line there, these were specific regulations that the court found that they were required to follow and did not. And he listed all of them. And then the second prong of that test, there's no public policy other than this broad government safety, national security, that the government cites for why this is a discretionary exception. So I see I'm basically out of time. So with that, I will submit. All right, thank you very much, counsel. All right, Ms. Chang. Thank you, Your Honor. So a couple of things that I just wanted to address very quickly. The government never conceded that the operation of these light armored vehicles was an inherently dangerous activity. The fact that these are deemed dangerous as a matter of military policy doesn't speak to whether or not this activity, if performed by a private person under like circumstances, would be deemed inherently dangerous as a matter of California law. That strikes me as intuitively odd because the military has special expertise to handle these things. So if it's deeming it a dangerous activity, think about it in the hands of a private person, it would be even worse. Well, the California cases say, for example, that the operation of a motor vehicle is a potentially dangerous instrumentality if handled improperly. But it is not so inherently hazardous as to always merit an extreme caution standard. With regard to the Prop 213 issue as to Mr. Martinez-Pineda, I just want to remind the Court that this lapse in the policy was not the first time that Mr. Martinez-Pineda had allowed this policy to lapse. It had lapsed three months prior, and that appears at Volume 7 of the Excerpts of Record. Yeah, but he cured that one. I'm sorry? But he cured that one. He did, Your Honor, so he had the capacity to cure this one. Well, he had the capacity to cure that one if he'd been notified that he was out of compliance. Right, but as my opponent said, I think that the law presumes that he received notice of it. And if it's ordinary policy and it's billed monthly, and if you don't pay the monthly bill, I get it. And to that, along those lines, Your Honor, the plaintiff's position on Prop 213 was always that there was some procedural deficiency with the manner in which they were notified that their policy had been canceled. There was never a question of ownership. So on the reversionary trust issue, is there any authority at all in California law, outside of this one particular statute about medical malpractice for doing what the district judge did on that, any authority at all in California law? In any California case, any California statute? Not any California cases that apply outside of the medical malpractice context. And why do you care? I mean, why do you want the reversionary trust? Well, the district court was particularly sensitive to the complexity and seriousness of Mr. Martinez-Pineda's condition and was cognizant of the fact that given the nature of his condition, the United States might be liable for future medical damages and expenditures that may simply never come to pass. And if the revised life expectancy is wrong on the other end, then the government gets a windfall under that theory? Well, the calculation of damages are always... Right, which is why we don't usually apply reversionary trust, because tradeoffs are made and so on. So the district court certainly wasn't required to impose a reversionary trust. Basically, the government's supposed to be liable to the same extent as a private person under the law of the state. There's no authority for applying a reversionary trust to a private person who would be liable under the law of California outside the medical malpractice context. Well, to my knowledge, there was no periodic payment statute at issue in the Hull case either. So in that case, the district court relied exclusively on its inherent authority to structure a damage award. So you're in favor of the judge having inherent authority when it comes to awarding damages, but having to follow California law to the letter when it comes to all of the negligence questions, right? Well, the question is whether or not the court abused its discretion, Your Honor. Again, it wasn't required to do it, but the question is whether it abused its discretion in structuring the damage award in the manner it did. Now, I realize I'm taking you over time on this, but could you address the life expectancy issue with respect to loss of consortium? Yes, Your Honor. So I agree that the Boken case, the California Supreme Court case that my opponent cited in their briefs, stands for the proposition that should you elect to consider life expectancy for loss of consortium, you should apply pre-accident life expectancy. But here, there was no evidence of pre-accident life expectancy. There was never any evidence or testimony taken as to... And is your position that the current life expectancy is therefore the same as the... I mean, I don't quite get it. So you're telling us we should just assume that there's no change in life expectancy as a result of the accident? No, Your Honor. What I'm saying is that the court never received evidence of Mr. Martinez-Pineda's actual pre-accident life expectancy. You're saying there's no evidence in the record from which you could figure out what that number would be? Correct. The data point that the party cited and that the experts cited in their report is the average statistic of a healthy male. Mr. Martinez-Pineda has pre-existing conditions that could potentially affect his life expectancy. So should we remand to allow that evidence to be introduced? Well, I don't think that a remand is necessary to the extent that the district court wasn't required to consider his life expectancy at all. Under California law, there's no set means of calculating loss of consortium damages. And at the end of the day, the court awarded Ms. Altaiba $9 million in loss of consortium damages. She hasn't made the argument that that's inadequate. She's just taking issue with the calculus. So I don't think that a remand is necessary. I think taking issue with the calculation is the same thing as saying it's inadequate. Fair enough, Your Honor. I'm running down on time. If there's anything specific that the court would like me to... Well, we're taking you over time, and I'm about to do a little more. Okay. I've not heard you argue anything about federal tort claims' discretionary function. The discretionary function... I take it that you do not view that as your strongest argument. It's not that we don't view it as our strongest argument, Your Honor. To the contrary, I think that issue is pretty straightforward. This case was always about signage and warning. It was never about leaving too late in the day. It was never about having a fragmented convoy. It was never about traveling for too many hours. That was just never an issue. And the policies that the court and the plaintiffs relied on simply don't speak to the specific actions that the Marines took under these circumstances. So the policies unquestionably applied to the Marines, but the specific actions that the district court was concerned with, there's simply no mandatory language in those policies at all. So again, the discretionary function... Those acts were never part of the plaintiff's case. They were never part of the plaintiff's theory of liability. But when the court took it upon itself to explore those issues, it erred in concluding that it could find liability, and it ascribed an additional, I think, 7.5% liability on those bases. So that's my response to that. There are no further questions? I don't think so. Thank you very much, Your Honor. Okay, thank you, counsel. Martinez-Pineda v. United States will be submitted. And this session of the court is adjourned for this week. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, FLETCHER, Kennelly